SCHMERTZ WIRE GLASS CO. et al. v. WESTERN GLASS CO.

(District Court, N. D. Illinois, E. D. March 17, 1913.)

No. 28,615.

1. PATENTS (§ 318*)—INFRINGEMENT—PROFITS RECOVERABLE.

Where there were devices or processes in the prior art open to the use of an infringer, the measure of profits recoverable by the patentee for the infringement is the difference between the profits made by the use of the patented device or process and that which would have been realized or lost on any other open to defendant's use.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*]

2. PATENTS (§§ 312, 328*)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

Evidence held sufficient to entitle a complainant to recover substantial profits from an infringer of the Schmertz patent, No. 12,443 (original No. 791,216), for an apparatus and process for manufacturing wire glass.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544–549; Dec. Dig. §§ 312, 328.*]

3. PATENTS (§ 318*)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

Defendant, which was a large manufacturer, was using a machine and process in the manufacture of wire glass which infringed complainants' patent, and a suit was brought for the infringement, in which a preliminary injunction was denied. Defendant was complainants' only competitor in the business, and, in order to control the market, complainants entered into a contract by which they took and paid for all of defendant's product during the term of one year pending the suit; the contract providing that it should be without prejudice to the legal claims of either party. Complainants were successful in the suit. Held, that they could not recover profits made by defendant during the contract year when it was in effect a licensee, but that the reservation of rights in the contract must be construed to apply only to such rights as they stood when the contract was made.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*]

In Equity. Suit by the Schmertz Wire Glass Company and the Mississippi Wire Glass Company against the Western Glass Company.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

On exceptions to master's report on accounting. Exceptions sustained in part.

Edward S. Rogers, of Chicago, Ill. (Arthur J. Baldwin and Drury W. Cooper, both of New York City, of counsel), for complainants.

Offield, Towle, Graves & Offield, of Chicago, Ill. (Chas. K. Offield and Albert H. Graves, both of Chicago, Ill., of counsel), for defendant.

SANBORN, District Judge. On exceptions to master's report on accounting finding nominal damages.

Defendant was decided to be an infringer in this cause ([C. C.] 178 Fed. 977; 185 Fed. 788, 109 C. C. A. 1), and an accounting for damages and profits awarded. Defendant was held to be using substantially the machine, and substantially the process, secured to the patentee in reissue No. 12,443. Upon the issuing of the injunction, and on February 10, 1910, defendant changed its method from the Schmertz process to the so-called European three-step process, which was held not to infringe in (C. C.) 188 Fed. 436, and on appeal, 195 Fed. 760, 115 C. C. A. 459. The master reported that, while defendant had realized profits, they were not proved with sufficient clearness, and that, since the noninfringing process had been open for defendant to use during the whole period of infringement, it was not liable for profits. He also reported that no damages could lawfully be imposed by reason of the infringement. After the master reported, the most important decision on patent accountings since Garretson v. Clark, 111 U. S. 120, 4 Sup. Ct. 291, 28 L. Ed. 371, was made by the Supreme Court, that of Westinghouse Co. v. Wagner Mfg. Co., 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222. The case involved the infringement of an electric converter. A combination of several old elements with two new ones was made by the patentee which gave an exceedingly beneficial result. After a period of infringement defendant changed its converter by leaving out one element of such combination, and thus escaped further infringement. In an accounting the master decided that defendant had made $134,000 in profits by the infringement, but that these profits were merged in the general business, so that it was impossible to separate them, because no separate account was kept, and the master recommended a decree for the whole $134,000. On appeal to the Court of Appeals of the Eighth Circuit (173 Fed. 361, 97 C. C. A. 621) it was held that the master erred in finding that the whole commercial value of the infringing converters was due to the patented combination, but was partly the result of improvements made by defendant-appellee; that, as complainant-appellant had failed to separate the profits made by the patent from those made by the defendant's addition, there was no evidence upon which a decree for profits could go; and that the rule as to wrongful confusion of goods did not apply.

A writ of certiorari was granted from the Supreme Court and the decree reversed. It will be observed that there was nothing in the record to suggest any standard of comparison, since there was no converter in the prior art adapted to obtain a result like that secured by the patent device; hence the Supreme Court, in stating the general rules governing the case, was not called upon either to cite or distinguish cases in which it had previously used a standard of comparison,

like McCreary v. Pennsylvania Canal Co., 141 U. S. 467, 12 Sup. Ct. 40, 35 L. Ed. 817.

With this state of facts before it the Supreme Court laid down the following rules:

"Where the infringer has sold or used a patented article, the plaintiff is entitled to recover all of the profits. Where a patent, though using old elements, gives the entire value to the combination, the plaintiff is entitled to recover all the profits. Hurlbut v. Schillinger, 130 U. S. 456, 472 [9 Sup. Ct. 584, 32 L. Ed. 1011]. Where profits are made by the use of an article patented as an entirety, the infringer is liable for all the profits 'unless he can show—and the burden is on him to show—that a portion of them is the result of some other thing used by him.' Elizabeth v. Pavement Co., 97 U. S. 126 [24 L. Ed. 1000]. But there are many cases in which the plaintiff's patent is only a part of the machine, and creates only a part of the profits. His invention may have been used in combination with valuable improvements made, or other patents appropriated by the infringer, and each may have jointly, but unequally, contributed to the profits. In such a case, if plaintiff's patent only created a part of the profits, he is entitled to recover that part of the net gains. He must, therefore, 'give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.' Garretson v. Clark, 111 U. S. 120 [4 Sup. Ct. 291, 28 L. Ed. 371]."

The court further observed that the statute expressly makes the infringer liable for all profits, but the rule as to the burden of proof has been so applied that this statutory right has often been nullified by infringers who had ingenuity enough to smother the patent with improvements made by themselves or third persons. "In such cases the greater the wrong the greater the immunity; the greater the number of improvements the greater the difficulty of separating the profits." The principle that the burden of showing profits is upon the complainant should not be pressed so far as to override others equally important in the administration of justice.

It was further held, however, that, where defendant shows that it uses noninfringing and valuable improvements in connection with its infringement, the burden of apportionment is on the complainant. This may be difficult to meet, but that is no reason why complainant should be denied its rights. It may be impossible to reach a conclusion mathematically exact, but expert or other evidence may be received on this question, in the same manner as in questions relating to state and interstate rates in cases brought to determine whether the former are confiscatory. When complainant shows that witnesses who have kept defendant's books, purchased material, etc., are unable to show what profits have been made, it has sufficiently met the burden cast upon it.

Finally, it was decided that the rule relating to trustees ex maleficio applies in patent cases, so that where complainant has made all possible proof of profits, and defendant has made clear proof impossible by inextricably mingling and confusing the parts composing the fund constituting such profits, the whole fund belongs to complainant.

While the full effect of this important case can only be told after the federal courts shall have applied it to the complicated and difficult circumstances appearing in patent accountings, yet it is evident that it marks an epoch in that most unsatisfactory chapter of the patent law. Undoubtedly the generally accepted construction of the Garretson Case has been much modified. As the Supreme Court said in another part of its opinion:

"It may be argued that in its last analysis this is but another way of saying that the burden of proof is on the defendant. And no doubt such, in the end, will be the practical result in many cases."

[1] It is not, however, to be inferred that it was intended to change the established rule as to the standard of comparison, since, as has been already stated, the case presented no such question. The patentee is entitled only to the actual advance he has made over the prior art, and the true measure of his recovery is the difference between the profits on the patented device or process and what would have been realized or lost on any other device or process open to defendant's use. Columbia Wire Co. v. Kokomo Steel & Wire Co., 194 Fed. 108, 114 C. C. A. 186, in the Circuit Court of Appeals of this circuit.

It was decided by the master that the European method was open to defendant at the beginning of the infringement, and it is urged with much force by its counsel that this conclusion is correct. It is said that the only thing new which Schmertz discovered was his method of wire feed and his combination—what our court of appeals well described as a single tool for the making of wire glass. It is further argued that the record shows that defendant made wire glass experimentally by the European method on one occasion before the infringement began, and on two occasions during its continuance, and that after the injunction was granted "it changed its practice in one day to the European three-step process." Further, that this process can be successfully carried out by the use of a single roll, and without the Schmertz wire carrier or any other. It is therefore confidently asserted that, since this practice antedated Schmertz, was unpatented, and open to use during the whole period of infringement, no profits or damages can be recovered, because Schmertz really never made any advance at all over the prior art. But the argument not only comes too late, but proves too much; it proves, if of any force whatever, that the Court of Appeals was wrong in its conclusion that the Schmertz reissue was valid. That decision was that the European three-step practice did not anticipate. Such is the binding conclusion between these parties. If so, it is most clear that defendant's return to that practice does not close or even narrow the gap between it and the Schmertz discovery. Defendant's real argument is that the patent in suit is invalid.

[2] The master also decided that no clear or sufficient evidence of the amount of profits appears from the evidence, and that nominal damages only could be awarded. On this point the question is whether evidence sufficient to fairly satisfy the rule of Westinghouse Co. v. Wagner Co. is to be found in this record. I have carefully read the whole of the evidence. Mr. Ryon, defendant's manager, re-

203 F.—64

peatedly testified that every item and element bearing on the subject of cost had been produced and put in evidence. The accounts were thoroughly and carefully kept, but there was no separation of cost between wire glass and other kinds produced. Estimates, however, and other corroborative proofs, appear, from which it is not difficult to get a pretty clear notion of the cost of producing the different products. The amount received for the sale of both sorts was carefully kept. It is not necessary to apply the rule of confusion of goods, since the amounts of profits on the wire glass can be ascertained with reasonable and sufficient certainty.

[3] Complainants also claim either as profits or damages the sum of $36,000 paid by them to defendant under a contract covering the year 1908. It appears that defendant's infringement began early in 1907, and this suit for an injunction was promptly brought, but a motion for temporary restraint denied. At the same time complainants had an infringement suit pending against the Pittsburg Plate Glass Company in which a temporary injunction had been granted. In November, 1907, a short term probatory was fixed in the Pittsburg case, so that it was inconvenient for complainants to follow up both cases at the same time. Defendant was the only competitor. In order, therefore, to protect the market, and enable complainants to prosecute vigorously the Pittsburg case, they entered into a contract with defendant for the year 1908 providing in substance as follows: This contract was between defendant, the Mississippi Wire Glass Company, and Tyler & Hippach, a jobbing corporation in Chicago buying and selling glass, and is dated January 3, 1908. Defendant agreed not to make or sell any wire glass except under the contract during the year 1908. It was to have the right to make and sell to the Mississippi Wire Glass Company a certain amount of quarter inch rough wire glass at eight cents per foot, and also sold it all merchantable wire glass then on hand at certain prices; but, if the Mississippi Company should reject any, Tyler & Hippach were to take it at the same price. The Mississippi Company agreed to pay defendant $3,000 a month, or $36,000 in all; and it was provided that the contract was made without prejudice to any of the alleged legal claims of the respective parties. This contract was completely carried out by all its parties.

It is evident that the agreement referred to radically changed the relations of the parties for the year 1908. For that period defendant, instead of being a trespasser on complainants' property, was a tenant or licensee. Complainants' remedies were in personam and ex contractu only. Had defendant used the patented machine and process only in that year no infringement suit could have been maintained. It had the option and right to use what the patent secured, and was paid $36,000 for ceasing infringement and alleged price cutting, and in order that complainants might have a free hand to prosecute the Pittsburg case. Now, after being thus enabled to maintain the monopoly, and give all their energies to a most important and critical litigation, after receiving these valuable benefits, it is argued that complainants may not only retain them but get back the

money paid for them also. This result, it is claimed, follows from the contract reservation referred to.

The stipulated reservation ought not to be given so unjust an effect if it can be interpreted to mean anything else. It means, I think, that the claims of all parties as to alleged infringement before the contract period commenced, or after it should end, were not to be affected. Surely it ought not to be so construed as to permit one party to repudiate the contract itself, and treat it as if it never had any existence. Any and all use of the patented machine and process, any and all sales of the product, were licensed and encouraged by the patent owner. Such owner received valuable benefits by reason of the contract relation, and cannot now be permitted to repudiate the consequences of that relation.

It follows, further, from the contract relation that defendant cannot be charged with any price cutting in 1908, alleged to have broken the market, and compelled complainants to reduce their schedule rates on polished wire glass. They claim $80,000 damages on account of reductions they were compelled to make by reason of alleged price cutting by defendant in 1908. On this subject the findings and conclusions of the master are approved.

The only question remaining is the amount of profits to be repaid by defendant for its infringement during the two periods before and after the contract term; that is, for 1907, and January 1, 1909, to February 10, 1910.

Taking the figures from defendant's account books, and allowing for profits on nonwire glass for 1907 and January 1, 1909, to February 10, 1910, amounting to $16,789.57, the account should, I think, be stated as follows:

| | | |
|---|---:|---:|
| Increase of assets in 1907, less $2,500 paid in capital... | $14,139.74 | |
| Increase January 1, 1909, to September 20, 1909, including $18,000 dividends paid.................... | 24,681.38 | |
| Increase September 20, 1909, to February 10, 1910..... | 20,520.92 | |
| Amount expended for patent litigation................ | 6,630.62 | $65,792.66 |
| | 65,792.66 | |
| Deduct profits on non-wire glass during same periods.. | 16,789.57 | 49,003.09 |
| Interest at 5 per cent. on net profits of $49,003.09 from July 1, 1909, to April 1, 1913, 3 years, 9 months.... | | 9,188.08 |
| Gross amount for profits chargeable to defendant.. | | $58,191.17 |

Deductions for Interest on Capital.

| | | |
|---|---:|---:|
| 5 per cent. interest on $72,503.68, capital in 1907, for 1 year ........................................ | $ 3,625.18 | |
| 5 per cent. on $131,797.70 capital January 1, 1909, for 8 months. 20 days................................ | 4,729.55 | |
| 5 per cent. on $138,479.08 capital September 20, 1909, for 4 months, 20 days........................... | 2,692.60 | 11,047.33 |
| Net sum chargeable to defendant for profits....... | | $47,143.84 |

The figures for profits on nonwire glass during the infringing periods were taken from the figures found in complainants' brief (page 19).

'The figures for defendant's gross profits during the infringing period, and for interest on capital, were taken from the accounting record (pages 621–623).

In computing interest in favor of complainants on defendant's net profits on wire glass July 1, 1909, was taken as an average date between the beginning and end of the infringing period, excluding the year 1908.

A decree should be entered for complainants April 1, 1913, for $47,143.84, with costs.